*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAMIKA COVINGTON,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>HAMILTON TWP. BD. OF EDUC and<br>CENTRAL JERSEY DISTRICT BOARD  #<br>193 of I.A.A.B.O. CORP. a/k/a INT'L ASS'N<br>OF APPROVED BASKETBALL<br>OFFICIALS, BOARD 193,<br><br>　　　　　　　　　Defendants. | Civ. No 08-3639 (FLW)<br>OPINION |

**WOLFSON, U.S. DISTRICT JUDGE:**

Presently before the Court are motions for summary judgment filed by Defendants Hamilton Township Board of Education ("HBOE") and the Central Jersey Board Number 193 of the International Association of Approved Basketball Officials ("IAABO") ("Board 193") (collectively, "Defendants"). Defendant seek summary judgment on the Second Amended Complaint filed by Plaintiff Tamika Covington ("Covington," or "Plaintiff"), which alleges discrimination and retaliation on the part of Defendants in violation of Title VII of the Civil Rights Act ("Title VII") and the New Jersey Law Against Discrimination ("NJLAD") in connection with Defendants' assignment of Plaintiff to officiate school districts' boys' varsity basketball games.

For the following reasons, Defendants motions are granted with respect to Counts One and Two, Plaintiff's Title VII claims. The Court declines to exercise jurisdiction over Counts Three and Four, Plaintiff's NJLAD Claims, and accordingly dismisses Counts Three and Four without

1

prejudice. The statute of limitations for Plaintiff's claims are tolled for thirty days pursuant to 28 U.S.C. § 1367(d) to allow Plaintiff time to re-file her NJLAD claims in state court.

## I.      Background

The following facts are undisputed unless otherwise indicated. Tamika Covington has worked as a basketball official for several years and joined the Board in or about 1996 or 1997. Covington July 1, 2013 Dep. 131:15–23. Board 193 is the exclusive assigning board of basketball officials to area junior high school, high school varsity basketball games, and other tournaments for the school districts in Central New Jersey. Pl.'s Stmt. of Facts ¶ 5; HBOE's Stmt. of Undisputed Material Facts ("HBOE's Stmt. of Facts") ¶ 13. HBOE represents one of the school districts in Central New Jersey that obtains and pays for basketball officials from Board 193. Covington officiated various games for the HBOE.

### <u>Board 193</u>

Board 193 is a corporate entity that functions as a closed shop "assignor" of basketball officials in Central New Jersey to area school districts during the operation of these districts' regular season basketball games and tournaments.[1] Pl.'s Stmt. of Facts ¶ 6; *see also* Mercer County Tournament Association Agreement with Board 193 for Basketball Assignments. Board 193 is managed by a President, who at all relevant times for 20 years has been Fred Dumont ("Dumont"). Pl.'s Stmt. of Facts ¶ 7; Dumont Dep. 7:21–8:7. Board 193 is further managed by an Executive Committee. Pl.'s Stmt. Of Facts ¶ 7; Dumont Dep. 15:15–17; 17:4–16. Board 193 assigns basketball officials to officiate at the following school districts: Hamilton, Trenton, Princeton, Ewing, Hightstown, Hopewell Valley, Lawrence, West Windsor, Allentown, and

---

[1] The Court notes that neither HBOE nor Board 193 provided responses to Plaintiff's statement of material facts, in contravention of Local Civil Rule 56.1. As such, the Court will take Plaintiff's statements of fact as true, unless contradicted in the record.

Robbinsville, as well as various local private and preparatory schools (collectively, "the School Districts"). Pl.'s Stmt. of Facts ¶ 8. The School Districts have organized themselves into a sports conference known as the Colonial Valley Conference ("CVC"), in which the member schools compete and play against each other.[2] HBOE's Stmt. of Facts ¶ 14; Pl.'s Stmt. of Facts ¶ 8.

Board 193 assigns all of the basketball officials that officiate at the CVC's games. HBOE's Stmt. of Facts ¶ 15. In order to work as a basketball official in the Central New Jersey area, Board 193 must assign a member of Board 193 to officiate a game for the individual school or conference. *See* HBOE's Stmt. of Facts ¶¶ 9, 13; Pl.'s Stmt. of Facts ¶ 9.

The person within Board 193 who assigns the individual board members to basketball games at the School Districts is known as the Assignor. Pl.'s Stmt. of Facts ¶ 10; Riley Dep. at 8:10–14. The Assignor is elected to that position by the full membership, for a three-year term. Pl.'s Stmt. of Facts ¶ 10; Riley Dep. at 11:19-12:1. During the relevant time period and until 2005, the Assignor for Board 193 was Frank Partyka. *See* Dumont Dep. 21:22–22:3. Beginning in or about 2005 until at least January 2014, the Assignor position has been held by Robert Riley. Pl.'s Stmt. of Facts ¶ 11; Riley Dep. at 8:18–12:9.

Board 193 has approximately 190 member officials. Pl.'s Stmt. of Facts ¶ 12; Riley Dep. at 18:23–24. At all relevant times, Board 193 has had only a handful of female member officials. Pl.'s Stmt. of Facts ¶ 13. Besides Covington, at various times, these female officials have included: Marci Youngblood (nee Willis) ("Willis"), Colleen White ("White"), Sabrina Isom ("Isom"), and Sandy Orapel ("Orapel").[3] Pl.'s Stmt. of Facts ¶ 13; IAABO Bd. 193 Varsity

---

[2] The CVC operates through the athletic directors of the School Districts and the Board of Control, comprised of the principals of the School Districts. Gielbert Dep. 35:12–19.

[3] The various named female officials joined Board 193 in the following years: (1) Willis, in 2005; (2) Isom, in 2001; (3) White, in 1999; and (4) Orapel, in 1975. Pl.'s Stmt. of Facts ¶ 14;

Officials 2006–07; List of Officials ("Zatuchni Certif. Tab EE"); 2006 Official Assignments ("Zatuchni Certif. Tab L"); 2007 Official Assignments ("Zatuchni Certif. Tab M"); 2008 Official Assignment ("Zatuchni Certif. Tab N"); 2009 Official Assignments ("Zatuchni Certif. Tab O"); 2010 Official Assignments ("Zatuchni Certif. Tab P"); Spreadsheet Containing Board 193's member official assignments, 2006–2010 ("Zatuchni Tab UUU").

Under Board 193's policies and practices, a member official is eligible to be assigned to officiate at varsity high school games once he or she achieves a "V" rating, which he or she obtains from the Executive Committee. Pl.'s Stmt. of Facts ¶¶ 17, 20; Dumont Dep. at 15:15–20, 16:4–11; *see also* Riley Dep. 19:21–23 ("Q: What the varsity designation means is that you're able to handle varsity games, correct? A: Correct."). Three "V" ratings exist, and are ranked as follows: V3, V2, and V1. Pl.'s Stmt. of Facts ¶ 18; Dumont Dep. at 14:22–24; Zatuchni Certif., Tab K. Dumont testified in his deposition that Board 193 employs an unwritten rule that it takes approximately five years from first joining Board 193 for an official to become eligible to achieve an initial V rating, thereby becoming eligible to handle varsity games. Pl.'s Stmt. of Facts ¶ 19; Dumont Dep. at 14:15–21. Dumont further testified that once an official has obtained a V designation, opportunities to officiate boys' and girls' varsity games should generally be equally open to the official. Pl.'s Stmt. of Facts ¶ 21; Dumont Dep. at 16:12–15 ("Q: Is there any distinction in the designation between boys['] varsity and girls' varsity games? A: None at all.").

**HBOE**

---

List of Officials Produced by Board 193 ("Zatuchni Certif. Tab EE"). Covington notes that "[s]ubsequent to the filing of this lawsuit, Mary Pat Lelinski joined Board 193 in 2010 and Karly Occhipinti joined Board 193 in 2009. Pl.'s Stmt. of Facts ¶ 15; Zatuchni Certif. Tab EE. "Additionally, at some point, Jacquelyn Richardson and Gwendolyn Grimes were members of Board 193, but the precise dates of their membership and/or participation is not known." Pl.'s Stmt. of Facts ¶ 16; Riley Dep. at 55:12-56:13. Riley testified that these two women "stopped being members sometime in or about 2006." Pl.'s Stmt. of Facts ¶ 16; Riley Dep. at 55:12–33.

HBOE, which represents Hamilton Township's public school district, is a part of the CVC. HBOE's Stmt. of Facts ¶ 14.

Peter Frascella ("Frascella") is HBOE's Assistant Business Administrator. HBOE's Stmt. of Facts ¶ 21. Frascella is in charge of HBOE's accounting, payroll, purchasing, food service, transportation, facilities, and operation departments. *Id.* On May 21, 2013, Frascella testified in a deposition that HBOE does not appoint officials to referee. *Id.*

The NJSIAA is an organization that certifies basketball officials with respect to a baseline quality and expertise. Pl.'s Response to HBOE's Stmt. of Facts ¶ 27. HBOE requires that all officials who officiate for the board be certified by the NJSIAA. *Id.* The NJSIAA requires officials to pass a National Federation Rules Examinations, attend NJSIAA training, and maintain certification and good standing. HBOE's Stmt. of Facts ¶ 28; Pl.'s Stmt. of Facts ¶ 27.

The Athletic Directors of the School Districts, including HBOE, set the times and locations of the officiating that Covington does for the School Districts, and the Athletic Directors impose various reporting requirements and procedures on the basketball officials. Pl.'s Stmt. of Facts ¶¶ 146, 148, 149.  However, the officiating rules are derived from the National Federation and the NJSIAA, not from HBOE. Gielbert Dep. 15:11–16:10; 23:20–14:3; *see also* NJSIAA Handbook at 5.

Once a basketball game is complete, the assigned basketball official's duties are also complete. HBOE's Stmt. of Facts ¶ 29. HBOE only paid Covington per basketball game for the services she provided to HBOE.[4] *Id.* ¶ 30. Covington does not receive vacation days from

---

[4] Covington states that "[t]he rate of pay for basketball officials is set by the Athletic Directors of the School Districts, with the ultimate approval of the Board of Control of the School Districts, in reaching an agreement with Board 193." Pl.'s Stmt. of Facts ¶ 141; *see* Gielbert Dep. at 37:17-38:7.

HBOE. HBOE does not provide Plaintiff with retirement or health benefits, workers'

compensation benefits, disability insurance, or pension benefits. *Id.* ¶ 35. HBOE did not

withhold taxes from Covington's pay at any time in her history of officiating for HBOE.[5] *Id.* ¶

36. Further, Covington paid for her uniform and whistle and provided her own transportation to

the basketball games to which she was assigned. *Id.* ¶ 42; Covington Apr. 13, 2011 Dep. 36:16–

24; 37:9–17.

HBOE can block or request that specific officials not be assigned to HBOE.[6] However,

HBOE states that it "has never exercised the option to block officials."[7] HBOE's Stmt. of Facts.

¶ 44; Pl.'s Response to HBOE's Stmt. of Facts ¶ 44.

**Tamika Covington**

---

[5] HBOE states that Covington "identified herself as an independent contractor conducting business as a referee on her 2007 and 2008 Individual Income Tax Returns. As a self-proclaimed independent contractor, Plaintiff claimed several business deductions, including her referee uniform, travel, car and truck expenses, insurance, legal and professional services, meals, training classes, and dues and subscriptions." HBOE's Stmt. of Facts ¶ 37. HBOE further states that Covington filed her 2008 tax return, in which she identifies herself as in independent contractor, after filing her initial Complaint in this matter. *Id.* ¶ 40.

Covington, in her response to HBOE's statement of facts, admits that "the School Districts, including Hamilton, did not issue . . . Covington a W-2, and therefore her tax preparers treated her compensation from being a referee as business income." Pl.'s Response to HBOE's Smt. of Facts ¶ 37.

[6] Covington states that, "[a]s a basketball official, [she] has no control over what games she is referred by Board 193 to work at a School District, except that she can block out times on the computer Arbiter system that she is not available to take on assignments." Pl.'s Stmt. of Facts ¶ 154; Covington Certif. ¶ 24. Covington further states that as a basketball official she "has no control over the level of game that she was assigned to by Board 193 to work at a School District." Pl.'s Stmt. of Facts ¶ 154; Covington Certif. ¶ 25.

[7] Covington disputes this characterization; however, she provides no evidence of a specific instance in which HBOE exercised this option.

Covington was at all relevant times rated as a V2 official.[8] Pl.'s Stmt. of Facts ¶ 23; Dumont Dep. at 14:1–4; Riley Dep. at 21:13-16; Zatuchni Certif. Tab K. However, Covington states that she "was effectively completely precluded from being assigned to officiate at boys['] high school varsity games."[9] Pl.'s Stmt. of Fact ¶ 25; Covington Certif. ¶ 20; Zatunchni Certif., Tabs L, M, N, O, P, UUU. Riley testified in his deposition that he never assigned Covington to any boys' varsity games. Pl.'s Stmt. of Facts ¶ 26; Riley Dep. at 17:20–18:6. However, Covington states that every male V2 official listed on Board 193's "Varsity Official 2006-2007" list has been assigned to multiple boys' varsity games from 2006 to at least January 2014. Pl.'s Stmt. of Facts ¶ 29; Zatuchni Certif. Tabs K, L, M, N, O, P;  Game Assignments 2010–11 ("Zatuchni Certif. Tab Q"); Game Assignments 2011-12 ("Zatuchni Certif. Tab R"), Game Assignments  2012-13 ("Zatuchni Certif. Tab S"), UUU.  Further, Covington states that "the vast majority of active Board 193 officials that were rated lower than Covington, as V3 officials, were also assigned to more boys varsity games than Covington, in some cases substantially so." Pl.'s Stmt. of Facts ¶ 30; Zatuchni Certif. Tabs K, L, M, N, O, P, Q, R, S, UUU; *see also* Zatuchni Certif. Tab EE (providing "year joined" information for officials).

Covington's experience officiating basketball games is detailed below. In addition to being a member of Board 193, Covington also officiates basketball games for other leagues and conferences. For example, Covington officiates basketball games for the Public League in

---

[8] Covington testified in her deposition that "she was falsely told by Assignor Robert Riley, as recently as 2009/2010 that she was only designated a V3 when he attempted to justify why he did not assign her to boys['] varsity games." Pl.'s Stmt. of Facts at 5 n.1. At his deposition, however, Riley "fully conceded that . . . Covington was designated as a V2." *Id.*; *see* Riley Dep. 21:13.

[9] Specifically, the first time she was assigned to a boys' varsity game was on December 8, 2006. She was also assigned a second game sometime during the 2012-2013 season. Feb. 14, 2014 Zatuchni Letter; Zatuchni Certif. Tabs M, UUU.

Philadelphia, which encompasses public high schools within the Philadelphia region, where she was "consistently and routinely assigned to officiate high school boys['] varsity games . . . for approximately five . . . years prior to the date of the deposition."[10] Pl.'s Stmt. of Facts ¶ 33; Covington Feb. 22, 2011 Dep. at 383:25–384:20; Covington's Boys' Varsity Basketball Schedule for the Public League of Philadelphia ("Zatuchni Certif. Tab T"). Additionally, Covington states that she has officiated men's basketball games for (1) the Sonny Hill/Baker League, a summer league in which the players are Division I, II, and III collegians, semi-pro players, and D league[11] . . . players," and (2) "various 'Pro-Am' or professional-amateur leagues in which professional basketball players, college players, and top-flight amateur players compete together."[12] Pl.'s Stmt. of Facts ¶¶ 35, 36; Covington Feb. 22, 2011 Dep. at 352:16–354:7, 402:23–403:5, 419:22–25.   Covington further states that she "engages in extensive officials training and development though participation in training camps and seminars." Pl.'s Stmt. of Facts ¶ 40; Covington Certif. ¶ 5; Certificates Pertaining to Tamika Covington ("Zatuchni Certif., Tab U").

The following individuals confirm Covington's qualifications to officiate men's basketball games: (1) Dalton Bramwell, assignor and Vice President of the Independent Basketball

---

[10] Covington states that "[i]n just one season directly prior to the deposition . . . she was assigned to approximately 10-12 boys['] varsity contests in the Philadelphia Public League." Pl.'s Stmt. of Facts ¶ 34; Covington Feb. 22, 2011 Dep. at 386:1–13.

[11] The D League is the NBA's development league. *See, e.g.*, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F.Supp.3d 955, 967 (N.D. Calif. Aug. 8, 2014).

[12] Specifically, Covington states that she has officiated "for several seasons at the Branchburg Pro-Am League in New Jersey," and for the East Orange High School Pro-Am league. Pl.'s Stmt. of Facts ¶¶ 38, 39; Covington Feb. 22, 2011 Dep. at 418:15–419:25.

Dumont disputes the importance of Covington's experience officiating at men's collegiate recreational leagues, stating that "[t]here are men's leagues games—they call them beer games— that are nightmares to referee and you need police officers there. You don't need a qualified basketball official to referee those games." Dumont Dep. 50:23–51:2.

Officials ("IBO") organization, *see* Barnwell Certif. ¶¶ 1–4; (2) James McKelvey, the President of District 12, Chapter 176 of the Pennsylvania Interscholastic Athletic Organization, *see* McKelvey Certif. ¶¶ 2–6; (3) James Smith, an assignor for the Philadelphia Public League, *see* Smith Certif. ¶¶ 1–4; (4) Dana Garner, an assignor for the Positive Image League, *see* Garner Certif. ¶¶ 1–4; and (5) Pastor Torres, an assignor for International Youth Basketball, *see* Torres Certif. ¶¶ 1–3. Further, Covington was included as a qualified NJSIAA playoff tournament official in NJSIAA observations[13] dated February 2006, November 2006, and November 2009, a designation that Covington claims confirms her merit because "the NJSIAA seeks out the best and most qualified officials to officiate at these games." Pl.'s Stmt. of Facts ¶¶ 47–52; Email from Sandra Orapel to Rob Riley ("Zatuchni Certif. Tab AA"); Nov. 2006 NJSIAA Rating Sheet of Basketball Officials ("Zatuchni Certif. Tab BB"); Nov. 2006 NJSIAA Rating Sheet of Basketball Officials II ("Zatuchni Certif. Tab CC"); Nov. 2009 NJSIAA Rating Sheet of Basketball Officials ("Zatuchni Certif. Tab DD").

Board 193's evaluations of Covington in the record through 2004 are dated (1) 2002; (2) January 3, 2003; (3) January 16, 2004; (4) February 3, 2004; and (5) December 21, 2004. Observations of Tamika Covington ("Zatuchni Certif. Tabs SS, TT, UU, VV, WW"). Covington characterizes the reviews as largely positive, and the record does not contradict this assessment.

**Board 193's Evaluations and Assignments of Other Board Members**

Covington argues that "[m]ale officials with worse evaluations, less experience, and lower ratings [than she] . . . have still received substantial [numbers] of boys['] varsity game assignments." Pl.'s Stmt. of Facts ¶ 53. Specifically, Covington points to the evaluations and

---

[13] As Covington explains it, "The NJSIAA assigns all the officials for these [playoff] Tournament Games, but seeks the input of observers through its own Observers Program, in proposing its top officials to be included in Tournament assignments." Pl.'s Stmt. of Facts ¶ 47.

total boys' varsity basketball game assignments of (1) Keith McRae, a V3 official, assigned to 26 games from 2006 to January 2014, *see* Zatuchni Certif. Tabs EE, FF, GG; (2) Pat Updegrove, a V3 official assigned 36 games from 2006 to January 2014, *see* Zatuchni Certif. Tabs EE; Observation Committee Observation of Pat Updegrove ("Zatuchni Certif. Tab HH"); (3) Tom Pihokken, a V2 official, assigned 7 games during the 2006 and 2007 seasons, (4) Mike Barbalaci, a V3 official, assigned 6 games during the 2006 and 2007 seasons, *see* Observation of Mike Baralaci ("Zatuchni Certif. Tab JJ"); (5) Thomas Dileo, a V3 official, assigned 8 games between 2006 and January 2014, *see* Observation Committee Observation of Thomas Dileo ("Zatuchni Certif. Tab KK"); (6) Bill Allen, a V2 official, assigned 10 games between 2006 and January 2014, *see* Observation Comm. Observation of Bill Allen ("Zatuchni Certif. Tab LL"); (7) John Young, a V2 official, assigned 103 games between 2006 and January 2014, *see* Observation of John Young ("Zatuchni Certif. Tab MM"); (8) Richard Kane, assigned 14 games between 2006 and January 2014, *see* Dumont Dep. at 55:2–56:24; and (9) Phil Smith, assigned 16 games between 2006 and January 2014, *see id.* Pl.'s Stmt. of Facts 53–75.

Covington states that "[t]he record in this case reveals that Board 193 had never in fact assigned any woman to officiate at a boys['] varsity game prior to . . . Covington's complaint letter to Board 193." Pl.'s Stmt. of Facts ¶ 77; Orapel Certif. Zatuchni Certif. Tabs L, UUU. In December 2006, Board 193 assigned boys' varsity games to Covington and Isom. Pl.'s Stmt. of Facts ¶¶ 78, 79; Zatuchni Certif. Tabs M, UUU. In total, through January 2014, the Board assigned 33 boys' varsity games to Isom and two boys' varsity games to Covington, and, in 2009, assigned three such games to Marci Willis. Zatuchni Certif. Tabs L, MM, O, P, UUU.

However, Covington states that three other female Board 193 members, Colleen White,[14] Jacquelyn Richardson, and Gwendolyn Grimes, were never assigned to any boys' varsity games. Pl.'s Stmt. of Facts ¶¶ 81–83; Zatuchni Certif. Tabs L, MM, O, P, UUU.

Covington argues that Isom was only assigned boys' varsity games "to deflect its discrimination and retaliation" against Covington. Pl.'s Stmt. of Facts ¶ 84. Covington points to two evaluations of Isom regarding her officiating of a game. The first evaluation labels her "[w]ith[]out a doubt . . . the most unprofessioal [sic] ref I have ever seen" and commented on her speed thusly: "[h]ustle on plays forget about it. [She] trailed so far behind as the trail official. This is not someone you want working at the varsity level." Observation of Sabrina Isom ("Zatuchni Certif. Tab OO"). The second evaluation similarly characterizes her officiating as a "[v]ery poor performance." Observation of Sabrina Isom II ("Zatuchni Certif. Tab PP"). However, Isom's overall performance is disputed: Orapel opined that Isom obtained varsity assignments because she is a "very competent official who moved up the ranks rather quickly because of her knowledge of the game and excellent court coverage." Orapel Certif. ¶ 10.

Orapel further states that female former Board 193 members Richardson and Grimes would have received boys' varsity game assignments if they had stayed with Board 193. Pl.'s Stmt. of Facts ¶ 88; Orapel Certif. However, Covington disputes this speculation, pointing to negative reviews received by both officials. Pl.'s Stmt. of Facts ¶¶ 88, 89; *see* Letter Written by Tomas Dileo dated Dec. 27, 2003 ("Zatuchni Certif. Tab RR"); Observation of Jacqueline Richardson ("Zatuchni Certif. Tab QQ").

As to Covington specifically, Covington states that Board 193 offered contradictory and false justifications for failing to assign her to boys' varsity basketball games. Specifically, Covington

---

[14] However, White states in a certification that "she is content to officiate" only girls' games. White Certif. ¶ 5.

first argues that Dumont's November 27, 2005 letter in response to her complaint of gender discrimination incorrectly states, "[t]his is your first year as a V-2 official. No first year V-2 official has received boys['] varsity assignments." Pl.'s Stmt. of Facts ¶ 126; Email to Tamika Covington from Fred Dumont dated Nov. 27, 2005 ("Zatuchni Certif. Tab NNN"). However, Covington asserts that "numerous V-3 officials, who had not even obtained V-2 status, have been assigned to boys['] varsity games."[15] Pl.'s Stmt. of Facts ¶ 127; Zatuchni Certif. Tabs K, L, M, N, O, P, Q, R, S, UUU.

Dumont further states in his November 27, 2005 letter that "[o]fficials who work varsity games and are NOT ranked in the V-1 category do so because they appear on a boys['] requested list from that particular school. In reviewing all the schools['] lists you do not appear on any of these." Pl.'s Stmt. of Facts ¶ 131; Zatuchni Certif. Tab NNN. However, Covington disputes Dumont's second justification, arguing that "Board 193 has not produced a single so-called 'Preferred List' in this litigation from any school to show whether . . . Covington was on any such list or not." Pl.'s Stmt. of Facts ¶ 132. Further, Covington argues that Dumont's justification in his letter is directly contradicted by Assignor Riley." Riley testified that the "Preference Lists" do not dictate the vast majority of his assignments. Pl.'s Stmt. of Facts ¶ 132; Riley Dep. at 90:17–20.

---

[15] Covington further asserts that "the Board's so-called five-year rule of thumb that an official will only become eligible for varsity status after five years is [a] . . . sham . . . . For example, Assignor Riley's son, Robert Riley Junior, only first joined Board 193 in 2007. Riley Jr. was assigned by his father to 3 boys['] varsity games in the 2007/2008 season . . . ." Pl.'s Stmt. of Facts ¶ 130; Zatuchni Certif. Tabs EE, L, M, N, O, P, Q, R, S, UUU. Covington also states that Dumont's son was immediately assigned boys' varsity games upon joining Board 193. Pl.'s Smt. of Facts at 34 n.15; Zatuchni Certif. Tabs EE, L, M, N, O, P, Q, R, S, UUU.

In his deposition, Riley testified that the first time he assigned his son to a boys' varsity game was during the 2009–2010 season. Riley Dep. at 64:11–17. However, Board 193's list of boys' varsity assignments indicates otherwise.

When Riley was asked about why he did not assign boys' varsity games to Covington, Riley testified in his deposition that he came to such a decision "[t]hrough evaluations that I have received from evaluation committees, from my personal observations of watching . . . Covington work on the sub-varsity level. I've spoken to . . . Covington about not being able to keep up with the pace of the game. She doesn't run the court very well at all. She does not control the game. There's numerous reasons." Pl.'s Stmt. of Facts ¶ 134; Riley Dep. at 18:4-22. Further, Covington disputes Riley's characterization of Covington's performance, pointing to Covington's actual evaluations and arguing that Riley "conceded that he personally observed her only twice in the past five . . . years: once at a JV boys['] game approximately [three] years prior to his deposition (i.e. in or about 2008), and another time at a game only a couple of weeks prior to his deposition in February 2011." Pl.'s Stmt. of Facts ¶ 136 (emphasis removed).

**Covington's Complaints to Dumont and Subsequent Fallout**

On November 21, 2005, Covington states that she approached Riley "to complain and discuss why, after ten . . . years with Board 193, she was not assigned to officiate at boys['] varsity games." Pl.'s Stmt. of Fact ¶ 90; Covington Feb. 8, 2011 Dep. at 148:14–150:24. According to Covington, Riley told Covington that "women don't work boys' varsity games" and that he "doesn't see any women working boys' varsity games and he's not going to set the precedent for that." Pl.'s Stmt. of Facts ¶ 91; *see* Covington Feb. 8, 2011 Dep. at 148:14–19. Thereafter, Covington states that she sent Riley by way of an email a "formal complaint of discrimination which documented his comments." Pl.'s Stmt. of Facts ¶ 92; Covington Feb. 8,

2011 Dep. at 153:7–23, 171:4–6, 172:16–23. However, Board 193 vigorously disputes the authenticity of the email, and Riley states that he never received such an email from Covington.[16]

Covington argues that beginning in 2006, her evaluations became negative, a turn of events which she attributes to Board 193's "need[] to concoct an excuse to avoid giving her boys['] varsity games. Pl.'s Stmt. of Facts ¶ 99; Jan. 21, 2006 Observation of Tamika Covington (" Zatuchni Certif. Tab XX"); Dec. 20, 2005 Observation of Tamika Covington ("Zatuchni Certif. Tab YY"); Jan. 23, 2006 Observation of Tamika Covington ("Zatuchni Certif. Tab ZZ"). Orapel specifically stated in a January 21, 2006 evaluation of Covington: "[c]an handle this type of game but must improve on ability to keep up with the transition to move up to a boys['] varsity game."[17] Zatuchni Certif. Tab XX. Dumont, in his deposition, conceded that the criticisms of Covington as stated in the January 21, 2006 evaluation were criticisms he might have had of many male officials who were and continued to handle handling boys' varsity games. Pl.'s Stmt. of Fact ¶ 101; Dumont. Dep. at 55:11–19.

Covington further argues that Board 193 began to arbitrarily enforce its fee and dues policies against her, which she attributes to retaliation by the board for her complaints to Dumont. In January 2005, Covington received a notice that she was being charged a $96 "double game fee" for being late to a game, which she paid. Pl.'s Stmt. of Facts ¶ 103; Covington Certif. ¶ 14; Email from Tamika Covington to Fred Dumont ("Zatuchni Certif. BBB"). However, Covington states that she learned that another referee was only charged a "single game fee" for being much later to another game. Pl.'s Stmt. of Facts ¶ 104; Covington Certif. ¶ 14; Zatuchni Certif. Tab

---

[16] On July 9, 2014, the Court held oral argument and an evidentiary hearing on the issue of the authenticity of the email; however, the Court did not reach a decision at the hearing.

[17] Covington states that the January 21, 2006 evaluation was "orchestrated" by Dumont and Riley, and that Orapel was sitting next to Dumont and Riley in the stands. Pl.'s Stmt. of Facts ¶ 100; Covington Certif. ¶ 13; *see* Zatuchni Certif. Tab XX.

BBB. Thereafter, Covington filed a "grievance" regarding what she characterized as disparate treatment and requested that her upcoming "Assignor Assessment" annual dues, amounting to $28.80, be subtracted from her "overpayment" and the balance of the "overpayment" be refunded to her. Pl.'s Stmt. of Fact ¶ 105; Zatuchni Certif. Tab BBB; Email Chain Between Tamika Covington and Board 193 ("Zatuchni Certif. Tab CCC"). Covington claims that she did not hear back from the Board regarding her grievance, but she was told in December 2006 that she was being suspended for her non-payment of dues and would not be assigned any games for the duration of her suspension. Pl.'s Stmt. of Facts ¶ 105; Covington Apr. 13, 2011 Dep. 45:5–23, 46:20–47:10; Covington Certif. ¶¶ 15–16.

In February 2007, Covington forwarded a check to Board 193 in the amount of $105, her annual dues for the year, which was cashed on April 19, 2007. Pl.'s Stmt. of Facts ¶ 106; Copy of Checks from Tamika Covington ("Zatuchni Certif. Tab DDD"). Covington paid her 2008 dues by check dated July 21, 2008, which was cashed on July 23, 2008. Pl.'s Stmt. of Facts ¶ 108; Zatuchni Certif. Tab DDD. However, Board 193 did not assign any games to Covington during the 2007–2008 season.[18] Pl.'s Stmt. of Facts ¶ 109; Covington Certif. ¶ 19, Letter from Takima Covington to Robert Riley dated Jan. 23, 2009 ("Zatuchni Certif. Tab FFF"); Letter from Tamika Covington to Fred Dumont dated Feb. 11, 2009 ("Zatuchni Certif. Tab GGG"); Letter from Tamika Covington to Fred Dumont dated Mar. 13, 2009 ("Zatuchni Certif. Tab HHH"); Letter from Fred Dumont to Tamika Covington dated Mar. 17, 2009 ("Zatuchni Certif. Tab III"); Letter from Tamika Covington to Fred Dumont dated March 2009 ("Zatuchni Certif. Tab JJJ"); Letter from Tamika Covington to Fred Dumont dated Oct. 7, 2009 ("Zatuchni Certif. Tab KKK");

---

[18] Covington further states that when she attempted to attend a board meeting in or around December 2007, "she was advised that the police would be called on her if she attempted to enter." Pl.'s Stmt. of Facts ¶ 107; Covington Certif. ¶ 18.

Email from Ms. Covington to Fred Dumont dated Oct. 21, 2009 ("Zatuchni Certif. Tab LLL"). In September 2008, Covington paid her outstanding Assigner Assessment to Riley, "[e]ven though she felt it was unfair and wrong for her to be treated differently than her male colleagues with respect to the 'double game' fine." Pl.'s Stmt. of Facts ¶ 110; Zatuchni Certif. Tab EEE. The payment was delivered on September 6, 2008. Pl.'s Stmt. of Facts ¶ 110; Def. Ex. 68. "Nevertheless, Board 193 continued to deny . . . Covington any games beginning in the 2008/2009 season." Pl.'s Stmt. of Facts ¶ 111; Covington Certif. ¶ 17; Zatuchni Certif. Tabs FFF, GGG, HHH, III, JJJ, KKK, LLL.

Covington inquired through her then-counsel about the Board's failure to assign her to any games and was told that Board 193 never received her checks. Covington and Dumont went back and forth over email about Covington's disputed non-payment, and Covington wrote to state that she was sending in another check in the amount of $508.80 despite maintaining that she had already paid any outstanding amounts of her dues and fees.[19] Pl.'s Stmt. of Facts ¶ 117; Zatuchni Certif. Tab JJJ. Covington emailed Dumont multiple times in October 2009 to inquire as to why her checks had not been accepted or returned. Pl.'s Stmt. of Facts ¶ 118; Zatuchni Certif. KKK, LLL. Covington was finally reinstated to Board 193 in 2009, and, as of January 2014, has received one boys' varsity game assignment since her reinstatement. Pl.'s Stmt. of Facts ¶ 119. Covington argues that Board 193's strict enforcement of its assessments policy is discriminatory and retaliatory because Dumont has exercised his discretion and waived the outstanding fees of several other Board 193 members, including Orapel, Isom, Rich Jackson ("Jackson"), and Tony

---

[19] Covington also states that she sent another check for the Assignor Assessment in January 2009. Pl.'s Stmt. of Facts ¶ 112; Zatuchni Certif. FFF.

Stevenson ("Stevenson").[20] Pl.'s Stmt. of Facts ¶¶ 120–123; 2008/2009 Outstanding Assessment Sheet ("Zatuchni Certif. Tab MMM").

**Procedural History**

On July 21, 2008, Plaintiff filed this action, alleging that HBOE, Board 193, Dumont, the NJSIAA, International Association of Approved Basketball Officials ("IAABO"), and the CVC engaged in gender employment discrimination against her in violation of Title VII of the Civil Rights Act and the NJLAD. In Count One of Plaintiff's Second Amended Complaint, Plaintiff alleges sex discrimination in violation of Title VII against all defendants except Dumont. In Count Two, Plaintiff alleges retaliation in violation of Title VII against all defendants except Dumont. In Count Three, Plaintiff alleges discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD") against all defendants. In Count Four, Plaintiff alleges retaliation in violation of the NJLAD against all defendants. In Count Five, Plaintiff alleges a violation of Title IX against HBOE.

On August 26, 2010, the district court[21] granted Defendants' motion to disimss Plaintiff's Second Amended Complaint. *Covington v. Int'l Ass'n of Approved Basketball Officials*, No. CIV.A. 08-3639 (GEB), 2010 WL 3404977, at *1 (D.N.J. Aug. 26, 2010). Plaintiff appealed the decision. On March 14, 2013, the Third Circuit reversed the district court's decision in part and remanded "to give Covington an opportunity to provide more facts as to her claim against

---

[20] Covington points to Stevenson's situation as the most glaring example of Board 193's allegedly discriminatory policy; Stevenson owed unpaid assessments and a fine totaling $167.60 for over "two seasons" before he finally paid what was owed; however, during that time, he was not suspended and, indeed, officiated boys' varsity games. Pl.'s Stmt. of Facts ¶ 123; Zatuchni Certif. Tabs L, M, N, O, P, MMM, UUU.

[21] Defendants' motion to dismiss was decided by the Honorable Garrett E. Brown, Jr., U.S.D.J. Judge Brown retired from the Court in 2012, and this case was reassigned to me in 2013, upon the Third Circuit's decision on Plaintiff's appeal.

Hamilton, Board 193, and NJSIAA."[22] *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013). After conducting discovery, Board 193, Dumont, and HBOE moved for summary judgment.

## II.    Standard of Review

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *Brooks v. Kyler,* 204 F.3d 102, 105 n.5 (3d Cir. 2000) (citing FED. R. CIV. P. 56(c)). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 305 (3d Cir. 1999). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* FED. R. CIV. P. 56(e); *Anderson,* 477 U.S. at 249. In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return

---

[22] The Third Circuit affirmed the District Court's dismissal of Plaintiff's claims against the CVC and IAABO as well as the District Court's dismissal of Plaintiff's Title IX claim in Count Five. *Covington,* 710 F.3d at 120, 120 n.6.

a verdict for the nonmoving party. *See Brooks,* 204 F.3d at 105 n.5 (citing *Anderson,* 477 U.S. at 249).

### III.    Analysis

The Court will analyze Defendants' motions for summary judgment on Plaintiff's Title VII claims in Counts One and Two,  before proceeding to Plaintiff's NJLAD claims in Counts Three and Four.

### a.   *HBOE's Motion for Summary Judgment on Counts One and Two*

In its motion for summary judgment, HBOE argues that Plaintiff is not an employee of HBOE, and, as such, there is no legal basis for Plaintiff's Title VII Claims against HBOE.

Title VII states in relevant part that it is unlawful for "an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex . . . or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's . . . sex." 42 U.S.C. 2000e-2(a). To assert a valid Title VII claim, a plaintiff must allege an employment relationship with the defendant. *Covington*, 710 F.3d at 119. To determine whether an individual has an employee-employer relationship with a defendant, the Third Circuit evaluates the following factors set forth in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (U.S. 1992):

> In determining whether a hired party is an employee under the general common law of agency, we consider [1] the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the

hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.

*Id.*; *see also Covington*, 710 F.3d at 119. Those individuals who are classified as independent contractors, rather than employees, are not protected by Title VII.

In the Third Circuit's decision on Plaintiff's motion to dismiss, the court took Plaintiff's allegations as true and held that "[b]ecause Hamilton has some input as to which officials are assigned to each game, chooses the time, date, and location of the games, and pays the officials for their work during the basketball games, with payment for work generally understood as one of the principal indicia of an employer-employee relationship, . . . Hamilton may fairly be identified as Covington's employer." *Id.* at 119.

While the significance of the relevant, undisputed facts as to "whether an employment relationship or an independent contractor relationship was created is vigorously debated, resolution of that debate is a question of law." *Kemether v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 15 F. Supp. 2d 740, 757 (E.D. Pa. 1998) (quoting *Cilecek v. Inova Health System Servs.*, 115 F.3d 256, 261 (4th Cir. 1997)); *see also Cox v. Master Lock Co.*, 815 F. Supp. 844, 845 (E.D. Pa. 1993), *aff'd*, 14 F.3d 46 (3rd Cir.); *Metro. Pilots Ass'n, L.L.C. v. Schlosberg*, 151 F. Supp. 2d 511, 519 (D.N.J. 2001). The Court will address each of the twelve factors of the employment relationship test to assess whether HBOE has proven at the summary judgment stage that it is not Plaintiff's employer for the purposes of Title VII liability.

  i.  *The Hiring Party's Right to Control the Manner and Means By*
*Which the Product is Accomplished*

"All other factors being equal, the right to control an individual's physical conduct may be determinative of whether the person is an employee or an independent contractor." *Metro. Pilots Ass'n, L.L.C. v. Schlosberg*, 151 F. Supp. 2d 511, 519 (D.N.J. 2001). Here, the NJSIAA, the

IAABO's parent organization, provides Plaintiff and other Board 193 basketball officials with the rules of the game; HBOE has no input regarding the rules. HBOE's Stmt. of Facts ¶ 25; Gielbert Dep. 15:11–16:10; 23:20–14:3 ("The rules are set by the National Federation, adopted by the NJSIAA, and carried out by the Colonial Valley Conference and as a school belonging to the Colonial Valley Conference . . . ."); *see also* NJSIAA Handbook at 5 ("All contests must be played according to the rules of the National Federation of State High School Associations."). While officials are to report to a HBOE coach or administrator upon arrival and to contact the HBOE's Athletic Director regarding any problems or concerns on the part of the school's players, coaches, or spectators, Gielbert Dep. 49:4–8, such requirements do not impact the manner and means by which Plaintiff officiates. Rather, the reporting requirements appear to merely allow the HBOE to record Plaintiff's presence and any complaints or concerns that any players, coaches, or spectators may have about the game and do not impact the substance of Plaintiff's work for HBOE, which is officiating. *Cf. Kemether v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 15 F. Supp. 2d 740, 760 (E.D. Pa. 1998) (finding that one of the hiring parties in that case, the Pennsylvania Interscholastic Athletic Association, exercised "some control over the manner and means by which plaintiff officiates by establishing and adopting rules for each sport, determining official interpretations of those rules, and training officials in those rules and interpretations"). Therefore, the record does not indicate that HBOE has the right to control the manner and means by which Plaintiff officiated HBOE's basketball games.[23] *See Metro. Pilots Ass'n*, 151 F. Supp. 2d at 520; *see also CBS Corp. v. F.C.C.*, 535 F.3d 167, 196 (3d

---

[23] To the extent other district courts analyze facts such as the hiring party's control over the hours kept by the hired party, the method of payment, and the employee benefits received by the hired party under the first factor, the Court analyzes those facts under the corresponding factors below. *See Metro. Pilots Ass'n*, 151 F. Supp. 2d at 520; *Cox v. Master Lock Co.*, 815 F. Supp. 844, 845 (E.D. Pa. 1993), *aff'd*, 14 F.3d 46 (3rd Cir. 1993).

Cir. 2008), *as amended* (Aug. 6, 2008), *cert. granted, judgment vacated on other grounds*, 556 U.S. 1218 (2009). As such, this important factor weighs against finding an employee-employer relationship between Plaintiff and HBOE.

### ii.  The Skill Required

Courts have found that the possession of a special set of required skills militates against finding an employee-employer relationship. *In re Olick*, 422 B.R. 507, 540 (Bankr. E.D. Pa. 2009) *aff'd*, 466 B.R. 680 (E.D. Pa. 2011) *aff'd*, 498 Fed. App'x 153 (3d Cir. 2012); *CBS Corp*, 535 F.3d at 197; *Metro. Pilots Ass'n*, 151 F. Supp. 2d at 520 ("Individuals who are unskilled labor are usually regarded as employees rather than independent contractors."). Here, I find that Plaintiff, as a basketball official, is a skilled worker, because it is undisputed that HBOE required Plaintiff to be certified by the NJSIAA. Indeed, this certification requires officials to pass a National Federation Rules Examination, attend NJSIAA training, and maintain their good standing. *See* HBOE Ex. N, "NJSIAA Handbook," at 2–3. Thus, this factor weighs against finding an employee-employer relationship.

### iii.  The Source of the Instrumentalities and Tools

An individual who provides her own necessary instrumentalities and tools for her profession is usually considered an independent contractor. *Metro. Pilots Ass'n, L.L.C.*, 151 F. Supp. 2d at 520–21. Here, it is undisputed that Plaintiff paid for her uniform and whistle and provided her own transportation to the basketball games to which she was assigned. Covington Apr. 13, 2011 Dep. at 36:16–24; 37:9–17. This factor also weighs against finding an employee-employer relationship between Plaintiff and HBOE. *Metro. Pilots Ass'n, L.L.C.*, 151 F. Supp. 2d at 520–21.

### iv.  The Location of the Work

22

As for the location of Plaintiff's work, work performed at the hiring party's location militates towards finding an employee-employer relationship. *Metro. Pilots Ass'n, L.L.C.*, 151 F. Supp. 2d at 520–21. Here, Plaintiff officiated games for HBOE at facilities within Hamilton Township. Therefore, this factor weighs in favor of finding an employee-employer relationship between Plaintiff and HBOE. *Kemether*, 15 F. Supp. 2d at 757.

### v.   The Duration of the Relationship Between the Parties

As for the duration of Plaintiff's employment, a longer employment relationship tilts towards finding an employee-employer relationship. *Metro. Pilots Ass'n, L.L.C.*, 151 F. Supp. 2d at 521. Here, the durational employment circumstances are similar to those in *Kemether*. In *Kemether*, which also involved a basketball official, "the duration of the relationship between the parties may be viewed as either long-term or short-term. Each selected official has an ongoing relationship for at least several years with PIAA [the Philadelphia Interscholastic Athletic Association] as a registered official receiving regular season game assignments. However, the assignment to officiate post-season games may involve only the duration of a single game, or [in the case of post-season tournaments] may involve several weeks of games . . . ." *Kemether*, 15 F. Supp. 2d at 761; *see also CBS Corp. v. F.C.C.*, 535 F.3d at 197. Therefore, this factor is neutral.

### vi.   Whether the Hiring Party Has the Right to Assign Additional Projects to the Hired Party

If a hiring party has the right to assign additional projects to the hired party, that right militates in favor of finding an employee-employer relationship. *Metro. Pilots Ass'n, L.L.C.*, 151 F. Supp. 2d at 521. Here, no party claims that HBOE had the right to assign additional projects to

Plaintiff. It is undisputed that Board 193's Assignor assigned games to Plaintiff, not HBOE.[24] *See* Pl.'s Stmt. Of Facts ¶ 10; *see* Riley Dep. at 11:23–12:1; HBOE's Stmt. of Facts ¶ 15. Further, it is undisputed that Plaintiff's duties for HBOE ended at the end of each assigned game. HBOE's Stmt. of Facts ¶ 29. Therefore, this factor weighs against finding an employee-employer relationship between Plaintiff and HBOE. *See Kemether*, 15 F. Supp. 2d at 761.

### vii.   *The Extent of the Hired Party's Discretion Over When and How Long to Work*

If the hired party has discretion over when and how long to work, such a fact weighs in favor of finding an employee-employer relationship. *Metro. Pilots Ass'n, L.L.C.*, 151 F. Supp. 2d at 521; *Marco v. Accent Pub. Co.*, 969 F.2d 1547, 1550 (3d Cir. 1992). Here, it appears that once Plaintiff was referred a game, she had no control over when and how long to work: Plaintiff has no discretion to alter the schedules or lengths of the games to which she is assigned.[25] Pl.'s Stmt. of Facts ¶ 146; Gielbert Dep. at 11:14–20, 31:12–23; Covington Certif. ¶ 25. However, Plaintiff states that "she can block out times on the computer Arbiter system that she is not available to take on assignments."[26] Pl.'s Stmt. of Facts ¶ 153. Thus, this factor is neutral.

---

[24] While the parties state that School Districts can issue "preference lists" that list their preferred officials to the Assignor, it is undisputed that the final decision as to whom to assign a particular game rests with the Assignor.

[25] However, it also appears here that the hiring party, HBOE, also does not have the specific power to set or alter the game schedules—the schedules are created by the CVC and "[e]ach athletic director [of the School Districts] is put in charge of a particular sport['s]" schedule and the athletic director in charge of overseeing the CVC's basketball schedule is Marty Flynn, the athletic director from West Windsor Plainsboro. Gielbert Dep. 11:18–12:21. Game schedules are set approximately ten months in advance. *Id.* 13:1–3. Further, the NJSIAA, not CVC or HBOE, decides when HBOE's basketball season begins and ends. *Id.* 15:7–9.

[26] However, according to Riley's testimony, occasionally "somebody calls and [says] they have to come off a game, and we have to go in, un-assign them, and reassign a new official." Riley Dep. 35:17–20.

*viii.   The Method of Payment*

Regarding the method of payment, it is undisputed that HBOE paid Plaintiff by the game for the games she officiated for HBOE. HBOE's Stmt. of Facts ¶ 30. Plaintiff's rate is set by the CVC, of which HBOE is a part; HBOE cannot individually negotiate with Plaintiff over her pay.[27] HBOE's Stmt. of Facts ¶ 31. Further, Plaintiff received no other form of employment benefits from HBOE, such as vacation days, retirement or health benefits, workers' compensation benefits, disability insurance, or pension benefits. HBOE's Stmt. of Facts ¶¶ 33, 36; *see also* Covington Feb. 25, 2011 Dep. 550:12–552:18; Covington July 1, 2013 Dep. 166:9–19. These facts weigh against finding and employee-employer relationship. *See, e.g.*, *Verdecchia v. Douglas A. Prozan, Inc.*, 274 F. Supp. 2d 712, 722 (W.D. Pa. 2003).

*ix.   The Hired Party's Role in Hiring and Paying Assistants*

Regarding the hired party's role in hiring and paying assistants, neither party presents arguments relating to whether Plaintiff officiated with the help of assistants, and, if so, what role Plaintiff had in hiring or paying any such assistants. Therefore, the Court will not consider this factor in its analysis.

*x.   Whether the Work is Part of the Regular Business of the Hiring Party*

---

[27] Plaintiff disputes HBOE's statement that "Plaintiff's rate of pay is set by the CVC, and Hamilton BOE does not have any input on the establishment of rates of pay." Pl.'s Response to HBOE's Stmt. of Facts ¶ 31. Rather, Plaintiff argues that "[t]he rate of pay for basketball officials is set by the Athletic Directors of the School Districts, with the ultimate approval of the Principals of the School Districts, in reaching an agreement with Board 193" and that "[i]n setting the payments rates for basketball official[s], the Athletic Directors and Principals are acting solely in their capacities as employees of School Districts." Pl.'s Stmt. of Facts ¶¶ 141, 142. While Plaintiff disputes the notion that HBOE does not have any input in the payment rate amount, it is undisputed that the amount is set by the CVC and not HBOE individually.

As for whether the work is part of the regular business of the hiring party, HBOE argues that "[t]here is no evidence to suggest that Plaintiff's work for Hamilton BOE was an integral part of the School District's regular business," instead arguing that HBOE's primary purpose is to "educat[e] young people" and that "[b]asketball games are not integral to Hamilton BOE's goals." HBOE's Br. at 12. Plaintiff, on the other hand, argues that "[p]art of the 'mission' of [HBOE], and all other School Districts, is to provide sports programs and sports education to its students," and that "Hamilton and other School Districts specifically employ Athletic Directors to run, manage, and operate these athletic programs." Pl.'s Stmt. of Facts ¶¶ 137–38 (citing Gielbert Dep. at 29:22–31:4). Viewing the facts in the light most favorable to the non-moving party, the Court agrees with Plaintiff and finds for the purposes of this motion that basketball games, and their officiating, is part of the regular business of HBOE and, thus, weighs in favor of finding an employee-employer relationship. *CBS Corp.*, 535 F.3d at 196.

### xi.   *Whether the Hiring Party is in Business*

As for whether HBOE is in business, the parties do not set forth arguments analyzing this factor. Viewing the facts in the light most favorable to the non-moving party, I conclude that for the purpose of this analysis, HBOE is "in business" in that it is an entity that employs multiple full-time individuals.  However, this factor is of limited utility to our overall analysis, "as almost any hiring party is in business." *Pasquale v. Gen. Sciences, Inc.*, Civ. No. 09-1735, 2010 WL 1558717, at *11 (E.D. Pa. Apr. 19, 2010) (quoting *Weary v. Cochran*, 377 F.3d 522, 525 n.1 (6th Cir. 2004)). Therefore, I accord this factor little weight.

### xii.   *The Provision of Employee Benefits*

Regarding the provision of employee benefits, "[i]ndependent contractors generally do not receive employee benefits." *Metro. Pilots Ass'n, L.L.C.*, 151 F. Supp. 2d at 524. As stated above,

Plaintiff received no employment benefits from HBOE, such as vacation days, retirement or health benefits, workers' compensation benefits, disability insurance, or pension benefits. HBOE's Stmt. of Facts ¶¶ 33, 36; *see also* Covington Feb. 25, 2011 Dep. 550:12–552:18; Covington July 1, 2013 Dep. 166:9–19. Therefore, this factor weighs against finding an employee-employer relationship between Plaintiff and HBOE. *See e.g.*, *Pasquale*, 2010 WL 1558717, at *11.

### xiii.   The Tax Treatment of the Hired Party

Finally, regarding HBOE's tax treatment of Plaintiff, it is undisputed that HBOE did not provide a W-2 to Plaintiff and never withheld any taxes on Plaintiff's behalf. Pl.'s Stmt. of Facts ¶ 36. Further, it is also undisputed that Plaintiff classified herself as an independent contractor in her 2007 and 2008 tax returns.[28] HBOE's Stmt. of Facts ¶¶ 37–40. Therefore, this factor weighs against finding an employee-employer relationship between Plaintiff and HBOE. *Pasquale*, 2010 WL 1558717, at *11.[29]

---

[28] Plaintiff argues that because HBOE never provided Plaintiff with a W-2, her tax preparers mistakenly classified her as an independent contractor. However, the fact remains that she submitted tax records to the IRS classifying herself as an independent contractor and claimed certain business deductions, including her referee uniform, travel, car, and truck expenses, training classes, and dues, in connection with her status as an independent contractor. *See* Covington 2007, 2008 Tax Records.  Further, Covington testified that she was referred to her tax preparers by another basketball official, so it appears that this firm had prior experience doing the taxes of, and thus, classifying, other basketball officials. Covington June 23, 2013 Dep. 55:9–14.

[29] In the interest of completeness, the Court will also consider any other relevant factors that have not specifically been enumerated in *Darden*. *See, e.g.*, *Bernhard v. TRC Global Solutions, Inc.*, No. CIV.A. 09-813, 2010 WL 4024606, at *5 (W.D. Pa. Oct. 13, 2010); *Alba v. Hous. Auth. of City of Pittston*, 400 F.Supp.2d 685, 692 (M.D. Pa. 2005). Here, other relevant facts are as follows. First, while HBOE has the right to request Board 193 not to refer certain officials to officiate at the school district's games, there is no evidence that HBOE ever exercised that right during the relevant time period, and Michael Gielbert, HBOE's Director of Educational Services, testified that HBOE did not evaluate the basketball officials. Gielbert Dep. 20:16–21:5. Second, "Board 193 will have an established rating system to be used to determine which officials are assigned to what games." Mercer County Tournament Association Agreement with Board 193

On balance, I find that the factors of analysis set forth in *Darden* weigh against finding an employee-employer relationship between Plaintiff and HBOE. Indeed, the only weighted factors of analysis that favor finding such a relationship are that Plaintiff had no control over the location of her work for HBOE and that her work took place on HBOE's premises.

In her opposition, Plaintiff heavily relies on the Eastern District of Pennsylvania's decision in *Kemether* and subsequent opinions issued in that case to argue that, like in *Kemether*, HBOE should be considered an employer under Title VII.

*Kemether*, like the case at bar, involved a referee suing for employment discrimination. The district court issued three relevant opinions: (1) in *Kemether*, 15 F. Supp. 2d 740 ("Kemether I"), the district court denied summary judgment on the issue of whether the school districts were the plaintiff's employers; (2) in *Kemether v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 1999 WL 1012948 (E.D. Pa. Nov 9, 1999) ("Kemether II"), the district court issued its findings of fact and conclusions of law in response to the plaintiff's motion for equitable relief; and (3) in *Kemether v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 1999 WL 1012957 (E.D. Pa. Nov. 8, 1999) ("Kemether III"), the district court issued an opinion denying the defendant's motion for judgment as a matter of law, or, in the alternative, for a new trial. Further, the Third Circuit, in *Covington*, 710 F.3d at 118, stated that it believed that Kemether III "was entitled to more serious regard than it was given by the District Court [in the district court's opinion dismissing Plaintiff's claims] in light of the similarity of the structure of the sport in the two states, the plaintiffs' claims, and the jury verdict for Kemether in the Eastern District of Pennsylvania." *Id.*

---

for Basketball Assignments at 2–4. Third, HBOE does not give the basketball officials it hires a copy of the HBOE's employee handbook. Gielbert Dep. 25:20–23. Finally, the NJSIAA sets out the procedure for school districts to follow when officials fail to arrive at or are unable to continue officiating a game. NJSIAA Handbook at 18–19. The majority of these factors do not favor finding an employee-employer relationship.

However, at this stage of the litigation, with all of the relevant facts before the Court, I find that the *Kemether* decisions are distinguishable, and, in any event, do not bind this Court. In Kemether III, the district court evaluated the evidence and found "no reason to disturb the jury's determination" that the plaintiff was an employee of the member schools. In that case, the jury found that there was an employee-employer relationship between the plaintiff and the member schools, a decision that appeared to hinge in part on factors not mentioned in the *Darden* analysis, such as the facts that (1) "[s]chools evaluate officials and can state whether they want particular officials working for them," and (2) "member schools created the [Pennsylvania Interscholastic Athletic Association] to organize and monitor interscholastic athletics and that organization sets the rules, establishes and enforces membership and uniform requirements, disciplines officials, and provides them with insurance." Here, however, there is no evidence that HBOE evaluated officials, including Plaintiff, and while HBOE theoretically has a right to exclude certain officials by submitting the names of excluded officials through Board 193's Arbiter computer system or by submitting a "preference list" to Board 193's assignor, there is no evidence that HBOE ever exercised that right during the relevant time period. *See* Riley Dep. 76:1–77:7, 87:20–89:16; Gielbert Dep. at 49:4–8. Further, while the CVC imposes certain reporting requirements on the officials, the NJSIAA—not HBOE—monitors interscholastic athletics and sets the officiating rules, and Plaintiff presents no evidence that HBOE has any role in providing insurance to Plaintiff. *See* Covington Feb. 25, 2011 Dep. 550:12–552:18. Finally, there is no evidence that HBOE imposed a uniform on officials; officials were expected to dress professionally, and any dress standards "are set in National Federation regulations." Gielbert Dep. 41:1–5; *see also* Mercer County Tournament Association Agreement with Board 193 for Basketball Assignments at 2–4.

Thus, I find that as a matter of law, Plaintiff is an independent contractor for HBOE. Therefore, HBOE is not subject to liability as an employer under Title VII and, as such, HBOE's motion for summary judgment on Counts One and Two of the Second Amended Complaint is granted. *Metro. Pilots Ass'n, L.L.C.*, 151 F. Supp. 2d at 524; *Pasquale*, 2010 WL 1558717, at *11; *see also, e.g.*, *Meyer v. U.S. Tennis Ass'n*, No. 1:11-CV-06268 ALC, 2014 WL 4495185, at *2 (S.D.N.Y. Sept. 11, 2014) (finding that, as a matter of law, tennis officials contracted by the United States Tennis Association to officiate at the U.S. Open were independent contractors).

Because I find that HBOE is not an employer for the purposes of Title VII, I need not proceed to the merits of Plaintiff's Title VII claim against HBOE.

### b. *Board 193's Motion for Summary Judgment on Counts One and Two*

Next, I proceed to analyzing Board 193's motion for summary judgment. Board 193 argues that summary judgment is appropriate for three reasons. First, Board 193 argues that it is not an "employment agency" as defined under Title VII. Second, Board 193 argues that Plaintiff has failed to make a *prima facie* case of retaliation on the part of Board 193 or, in the alternative, Plaintiff has failed to prove pretext. Finally, Board 193 argues that Plaintiff's "aiding and abetting" claim under the NJLAD against Board 193 and Fred Dumont must fail because Board 193 and Fred Dumont could not aid and abet HBOE since HBOE was not Plaintiff's employer or, in the alternative, because there is no evidence that either party aided and abetted in any discrimination.

Board 193 first argues that it is not an employment agency as defined under Title VII and, thus, the Court should grant summary judgment in favor of Board 193 as to Counts One and Two of Plaintiff's Second Amended Complaint, which allege sex discrimination and retaliation on the part of Board 193.

In Count One, Plaintiff alleges in relevant part that Board 193 discriminated against Plaintiff "in the assignment of basketball games in violation of 42 U.S.C. 2000e-2(b) applicable to 'employment agencies.'" Second Am. Comp. ¶ 159. Further, Plaintiff alleges that Board 193 discriminated against Plaintiff "in violation of the employment 'interference' provision of 42 U.S.C. § 2000e-2(a)(1).

42 U.S.C. § 2000e-2(b), the Title VII provision pertaining to discrimination on the basis of protected status, states that

> it shall be an unlawful practice for an employment agency to fail or refuse to refer for employment or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

*Id.* 42 U.S.C. § 20003-3, the Title VII provision pertaining to retaliation, states in relevant part that

> It shall be an unlawful employment practice for an . . . employment agency . . . to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*Id.*, 42 U.S.C. § 2000e(c) defines "employment agency" as "any person regularly undertaking with or without compensation to procure or to procure for employees opportunities to work for an employer and includes an agent of such a person." *Id.* "[T]he definition does require that, in order to be an 'employment agency,' the entity must regularly do business with an 'employer,' and the term 'employer' as used in the definition of 'employment agency' is limited to those employers that fall within the definition of 'employer'" under Title VII. *Kemether*, 15 F. Supp. 2d at 763 (internal citations and quotation marks omitted); *accord Schrock v. Altrue Nurses Registry*, 810 F.2d 658 (7th Cir. 1987).

Finally, 42 U.S.C. § 2000e-2(a), the Title VII provision pertaining to employment "interference," states:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .

*Id.*

Board 193 argues that it is not an employment agency because "[t]he language of the statute directs that there be an employment relationship between the plaintiff and . . . the proposed employer." Board 193's Br. at 3–4. Plaintiff does not dispute this proposition; rather, Plaintiff argues that Board 193 is an employment agency because HBOE is an employer. However, I have found, *supra*, that HBOE and Plaintiff did not have an employee-employer relationship and, thus, that HBOE was not an employer for the purposes of Title VII.

"As in all cases of statutory interpretation, [my] inquiry begins with the language of the statute and focuses on Congress' intent." *United States v. Abbott*, 574 F.3d 203, 206 (3d Cir. 2009) *aff'd*, 562 U.S. 8 (2010). Here, the Court finds that the plain meaning of 42 U.S.C. 2000e-2(b) confirms that in order for Board 193 to be considered an employment agency under Title VII, Board 193 must regularly undertake to procure opportunities for employees to work for an employer. *Id.*; *see also Kemether*, 15 F. Supp. 2d at 763. However, Plaintiff has not provided any evidence that Board 193 regularly undertakes such a task; the only potential employer to which Plaintiff has pointed is HBOE, which the Court has determined did not have an employer-employee relationship with Plaintiff, but rather hired Plaintiff as an independent contractor. Therefore, Board 193 cannot be held liable as an employment agency under Title VII and, thus,

Plaintiff's discrimination claims premised on Board 193 being an employment agency, in Counts One and Two, must fail.

Regarding Plaintiff's sub-claim in Count One that Board 193 discriminated against  Plaintiff in violation of the employment "interference" provision of Title VII, *see* 42 U.S.C. 2000e-2(a)(1), the language of the provision only applies to employers. *Id.* Here, Plaintiff has not provided any evidence or arguments that Board 193 is an employer.[30] *See generally* Second Am. Compl, Pl.'s Opp Br. Therefore, Plaintiff's employment interference claim contained in Count One must also fail.

---

[30] Indeed, Board 193 states, and Plaintiff does not dispute, that Board 193 is a non-profit corporation that is largely composed of dues-paying members, some of whom volunteer for the Board and only two of whom receive any remuneration from the Board, consisting of a stipend. Board 193's Stmt. of Facts ¶ 10.

In *Kemether*, the district court found that "[t]he phrase 'otherwise to discriminate against any individual' defines unlawful employment practices so broadly that in some cases, courts have not required any showing of an employment relationship between a plaintiff and defendant" and held that "because 42 U.S.C. § 2000e–2(a)(1) broadly prohibits employment discrimination against "any individual" rather than any employee, . . . a Title VII defendant need not be the plaintiff's employer to interfere impermissibly with plaintiff's employment opportunities." The Court further held that a "defendant's interference with plaintiff's outside employment relationships may be an independent basis for Title VII liability, where the defendant controls access to employment opportunities with third parties." *Kemether*, 15 F.Supp.2d at 762; *see also Ware v. Ball Plastic Container Corp.*, 432 F. Supp. 2d 434, 438 (D. Del. 2006).

However, this proposition is inapposite here for two reasons. First, *Kemether* held that "[e]ven though [the defendant] need not be [the plaintiff's] employer in fact, a defendant still must be 'an employer' as defined in the statute to be subject to coverage under § 2000e–2(a) in the first instance. The definition of 'employer,' for purposes of inclusion within the scope of Title VII, is found in 42 U.S.C. § 2000e(b). That subsection requires the employer to have at least fifteen employees, for at least twenty calendar weeks." *Id.* Here, the evidence demonstrates that Board 193 is not an employer, because it does not employ at least fifteen employees for at least twenty calendar weeks. *See* Board 193's Stmt. of Facts ¶ 10. Second, *Kemether* still required that "[w]here the defendant is not plaintiff's employer in fact, it is the third-party relationship that must meet the common-law tests of an employment relationship under *Darden*." *Id.* Here, the third-party relationship to be tested is the one between Plaintiff and the school districts to which she was assigned to officiate, and I found that Plaintiff's relationship to HBOE, the only potential employer to which Plaintiff has pointed, was not an employee-employer relationship.

As such, summary judgment on Counts One and Two of Plaintiff's Second Amended Complaint is granted in favor of Board 193. *Kemether*, 15 F. Supp. 2d 740, 764 (E.D. Pa. 1998) ("[A] person who procures independent contractors is not considered an employment agency under 42 U.S.C. § 2000e(c).").

### c. Counts Three and Four – NJLAD Claims

The Court has concluded that summary judgment is granted in favor of Defendants on Plaintiff's Title VII claims in Counts One and Two and, as such, those claims are dismissed. Plaintiff filed her claims in federal court on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331, *see* Second Am. Compl. ¶ 8, and Plaintiff's Title IX claim in Count Five was dismissed on the pleadings and affirmed by the Third Circuit, *see Covington*, 710 F.3d at 120, 120 n.6. Thus, all that remain are Plaintiff's state law, NJLAD claims in Counts Three and Four of the Second Amended Complaint, over which Plaintiff alleges the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). Second Am. Compl. ¶ 9.

"It is a principle of first importance that the federal courts are tribunals of limited subject matter jurisdiction." 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3522. 28 U.S.C. § 1367(c) states in relevant part that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction." As the Supreme Court has stated in its seminal opinion on this issue, "[i]t has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right . . . . Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The Third Circuit has "recognized that, 'where the claim

over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis added) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); *see also Burnsworth v. PC Lab.*, 364 Fed. App'x 772, 776 (3d Cir. 2010). Put another way, "[a]bsent extraordinary circumstances, 'jurisdiction over claims based on state law should be declined where the federal claims are no longer viable.'" *Kalick v. Nw. Airlines Corp.*, 372 Fed. App'x 317, 322 (3d Cir. 2010) (quoting *Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984)). Further, no authority in the circuit has required that a district court retain jurisdiction over state law claims where the Court has awarded summary judgment to the defendants on a plaintiff's federal claims. *Garges v. People's Light & Theatre Co.*, 529 Fed. App'x 156, 164 (3d Cir. 2013) *judgment entered*, No. 13-1160, 2013 WL 3455818 (3d Cir. June 28, 2013) *cert. denied*, 134 S. Ct. 930 (2014).

Here, the Court exercises its discretion to decline to retain jurisdiction over Plaintiff's NJLAD claims, for the following reasons. First, the analysis of Plaintiff's discrimination and retaliation claims under the NJLAD may differ from that under Title VII; as the Third Circuit has noted, "[t]he LAD is a remedial statute, in some respects broader and more flexible than Title VII. This is so even though New Jersey often looks to the federal system for interpretive authority." *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 121 n.19 (3d Cir. 1999). Therefore, rendering a decision on Plaintiff's NJLAD claims would require the Court to engage in further analysis that may be specific to the NJLAD. *See Garges*, 529 Fed. App'x at 164 (affirming a district court's decision to decline to exercise federal jurisdiction over the plaintiff's remaining

state law claims in part because the legal standards that apply to those claims differed from the standards that applied to the plaintiff's federal claims).

Second, the Court does not find that considerations of judicial economy, convenience, or fairness to the parties provide extraordinary circumstances for the Court to retain jurisdiction. Although this case has been pending in this Court for some time and the parties have taken discovery, the parties are able to use the information gleaned in discovery in the state court proceedings. *Annulli v. Panikkar*, 200 F.3d 189, 203 (3d Cir. 1999), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000). And as far as fairness to Plaintiff, Plaintiff and her attorneys "knowingly risked dismissal of [her] pendent claims when they filed suit in federal district court and invoked the Court's discretionary supplemental jurisdiction power." *Id.* Moreover, Plaintiff will not be barred by any statutes of limitations from pursuing her claims in state court; 28 U.S.C. § 1367(d) states that

> [t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

*Id.*; *see also Petrossian v. Cole*, No. 14-4650, 2015 WL 3396819, at *3 (3d Cir. May 27, 2015) ("When a District Court declines to exercise supplemental jurisdiction over state law claims, the statute of limitations is tolled while the federal suit is pending and for a period of 30 days after the suit is dismissed.") (citing 28 U.S.C. § 1367(d)).

Therefore, this Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims; as such, Counts Three and Four are dismissed without prejudice for Plaintiff to re-file in state court.

**IV.     Conclusion**

For the foregoing reasons, the Court grants summary judgment in favor of Defendants on Counts One and Two of Plaintiff's Second Amended Complaint. The Court further declines to exercise supplemental jurisdiction over Counts Three and Four of the Second Amended Complaint, and, accordingly, dismisses Counts Three and Four without prejudice. The statute of limitations for Plaintiff's claims are tolled for thirty days pursuant to 28 U.S.C. § 1367(d) to allow Plaintiff time to re-file her NJLAD claims in state court.

Dated: June 15, 2015                                  /s/ Freda L. Wolfson
                                                 The Honorable Freda L. Wolfson
                                                  United States District Judge